UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
DONALD C. HILLMAN              )
and MICHAEL E. MECSAS,         )
         Plaintiffs            )
                               )    Civil Action No. 03cv12345 RGS
v.                             )
                               )
SCHNADER HARRISON SEGAL        )
& LEWIS, LLP, et al            )
         Defendants            )
                               )
```

RECEIVED
Clerk's Office
USDC, Mass.
Date 4-19-04
By _____
Deputy Clerk

## OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS AND/OR FOR SUMMARY JUDGMENT

### INTRODUCTION

The defendants' motion must fail because it ignores facts which cannot be disputed and which undermine their argument and it relies on facts which are immaterial and irrelevant. There can be no disposition of this case prior to trial unless the facts and the law presented by the plaintiffs herein remain undisputed by the defendants. Since this will hardly be the case, the defendants' motion has no vitality and must be denied.

### STATEMENT OF FACTS

The facts as set forth in the Memorandum of Law in Support of Defendants' Motion For Judgment on the Pleadings and/or for Summary Judgment ("Def. Mem.") are, for the most part, correct and will not be repeated here. Rather, the plaintiffs wish to call to the Court's attention four factual issues either omitted or mischaracterized by the defendants.

    A.    <u>Contents of the Letter Agreements</u>

The Mecsas Letter Agreement dated January 21, 2002 and the Hillman Letter Agreement dated June 30, 2002 are the basis upon which this suit was brought. The Letter Agreements are

similar but not identical, (Exs. B and C to the Complaint). For instance, the Hillman Letter Agreement has a provision for Retirement Plan Rollovers which the Mecsas Letter Agreement does not. (Complaint, Ex. C at ¶ 5). The mutual releases are not the same. In the Mecsas Letter Agreement, there is a carve-out in Mecsas' release whereby he does not release Schnader, Harrison Segal & Lewis ("SHSL") or its partners from any future claim that arises from SHSL failing to timely pay its debts and liabilities and SHSL indemnifies Mecsas against any such claim. (Complaint, Ex. B at ¶ 13). In the Hillman Letter Agreement, there is no such carve-out. However, there is a provision whereby Hillman is not discharged from his obligations under Section 12.08 of the Partnership Agreement, which holds a retiring partner liable for a period of three years after his/her withdrawal for bank debt or any individual liability on any real property lease in effect as of the date of withdrawal from SHSL. (Complaint, Ex. C at ¶ 14).

There is one provision common to both the Mecsas Letter Agreement and the Hillman Letter Agreement which is entirely pertinent hereto but which was omitted from the Factual Background in Def. Mem. Paragraph 14 in the Mecsas Letter Agreement and Paragraph 15 in the Hillman Letter Agreement are entitled "<u>Prior Agreements Superceded</u>" and these paragraphs state:

> This letter sets forth the entire understanding and agreement between you and the Firm and supercedes all prior agreements and undertakings, including the provisions of the Partnership Agreement.[1] This letter may not be altered, amended or supplemented except by an instrument in writing signed by you and a member of the Executive Committee of the Firm.

(Complaint, Ex. B ¶ 14, Ex. C ¶ 15).

---

[1] In the Mecsas Letter Agreement, the sentence stops after the words "Partnership Agreement." In the Hillman Letter Agreement, those words are followed by the phrase "except as otherwise specified hereunder."

2

B.  Computation of Amounts Owed

In the Letter Agreements, the amounts set forth as Mecsas' and Hillman's capital accounts are set forth as a single number: $139,774 in Mecsas' case and $102,116.17 in Hillman's case. (Complaint, Exs. B and C ¶ 3). The fact that these amounts were to be paid in three equal annual installments without interest beginning a year after withdrawal was presumably for the benefit of SHSL. However, that fact does not detract from the fact that the capital accounts of these former partners of SHSL were single numbers, not three separate numbers.

The deferred compensation calculation, while considerably more complicated, also results in a single number due to the retiring partner, albeit to be paid in twenty equal installments. The calculation was done by totaling the five highest years of a partner's compensation over the previous ten years and then determining the average by dividing by five. (Deferred Compensation Agreement attached as Exhibit D to the Declaration of Diana S. Donaldson ("Declaration") at ¶ 3(a)(i)). This amount is then multiplied by 150% in order to determine the Maximum Deferred Compensation Benefit. (Id.) Then, an Applicable Vesting Factor and an Applicable Age Factor is applied. (Declaration, Ex. D at ¶¶ 1.1, 1.2, 3 (d)). This amount is further reduced by the value, in the case of a former shareholder of Goldstein & Manello ("G&M"), of that shareholder's interest in the G&M Profit Sharing Plan (Declaration, Ex. D at ¶ 3(g)(i)). This produces a net benefit value, which in Hillman's case, was $262,503.98.[2] (Complaint, Ex. C attachment). The net benefit value is then divided by twenty to

---

[2] The Mecsas Letter Agreement does not contain the full calculation because, at the time it was drafted, the value of his interest in the G&M Profit Sharing Plan had not been calculated as of December 31, 2001. The parties agree, however, that Mecsas' net benefit value was $387,668.20 payable in twenty installments of $19,383.41.

arrive at the twenty payments due bi-annually. However, the installment payments were derived from a single number: the net benefit calculation.

    C.    <u>SHSL Partners' Contacts With Massachusetts</u>

In the last paragraph of the Factual Background in Def. Mem., the individual defendants distance themselves from Massachusetts. They do not reside or own property in Massachusetts. (Def. Mem. at 6) Other than Ralph G. Wellington who signed the Deferred Compensation Agreements, no partner had anything to do with the two Letter Agreements or the two Deferred Compensation Agreements. (<u>Id.</u>) However, the Letter Agreements, in the releases, refer to the "Firm and its partners" and SHSL partners get the benefit of Mecsas' and Hillman's release of any claims they may have against the individual SHSL partners, except those arising from a breach by SHSL of the Letter Agreements. (Complaint, Ex. B at ¶ 13, Ex. C at ¶ 14). With respect to those claims, the Letter Agreements permit Mecsas and Hillman to "pursue any and all remedies" should SHSL breach its obligations under the Letter Agreements.

While SHSL had its Boston office open from the beginning of 2000 through the end of 2002, many SHSL partners did business in Massachusetts. During that time, there was a great deal of interaction between the various offices of SHSL and its Boston office. (Affidavit of Michael E. Mecsas ("Mecsas Aff."), a copy of which is attached hereto as Exhibit A at ¶ 6). It should be noted here that, beginning in January 2000, SHSL did business in Boston under the name Schnader Harrison Goldstein & Manello (SHGM) (Mecsas Aff. at ¶ 5). SHGM was not a separate entity. SHSL was SHGM in Boston (<u>Id.</u>).

The Agreement dated January 14, 2000, whereby the fourteen G&M shareholders became partners of SHSL, was negotiated in Boston, from time to time, by SHSL partners.

4

(Mecsas Aff. at ¶ 6). Ralph Wellington, the Chairman of SHSL, visited SHGM offices on a regular basis. (Id.). Executive Committee Meetings would sometimes be held in Boston. (Id.). Various SHSL attorneys would come to SHGM offices in connection with attending depositions. (Id.). SHSL partnership meetings would be held by teleconferencing, with some SHSL partners participating from Boston and others participating from Philadelphia and elsewhere. (Id.). There were meetings in Boston of the SHSL Business Practice Group. (Id.). There were SHSL marketing and administrative meetings held in Boston. (Id.). SHSL partners from the Boston and Philadelphia offices solicited business in Massachusetts by meeting with representatives of Massachusetts entities and by making presentations concerning their expertise. (Id.).

During 2000 and 2001, all G&M receivables generated for work done prior to January 1, 2000 were payable to G&M. (Mecsas Aff. at ¶ 7). G&M used these funds to pay current (2000 and 2001) expenses of SHGM. (Id.). All receivables generated for work done after January 1, 2000, when collected, were deposited in a SHSL account d/b/a SHGM, which SHSL controlled. (Id.). When the pre-2000 receivables did not generate sufficient funds to meet the expenses of the SHGM office, SHSL would make a payment to the SHGM office to make up the shortfall. (Id.). Beginning on January 1, 2000, billing to all Massachusetts clients was done in the name of SHGM through SHSL's Philadelphia office. (Id.) Many collection efforts were handled by SHSL's Philadelphia office. (Mecsas Aff. at 6).

Except for the special arrangements with respect to the pre-2000 G&M receivables, all of the earnings of all SHSL's offices in various states, including Pennsylvania, New York, New Jersey, California, Georgia and Massachusetts, as well as those from the Washington D.C. office, were commingled and payments to partners were made with commingled funds. (Mecsas Aff. at ¶ 8). For this reason, beginning in 2002, Mecsas was informed that he had to file a tax return in

5

several states in which SHSL had an office. (Id.). It follows, then, that all SHSL partners who do not reside in Massachusetts nevertheless have to file a Massachusetts tax return reporting income which had been generated in Massachusetts, beginning in 2000 and continuing for any subsequent years until such time as SHSL no longer receives any Massachusetts income. (Id.).

### D. Unpaid Payments

The defendants argue that Mecsas is owed nothing in deferred compensation because he received one installment payment a year early and the complaint was filed before the second installment came due. (Def. Mem. at 18). This ignores the fact that, when Mecsas was notified that an error had been made, he told the SHSL accountant that they should deduct the payment from the next payment due him from SHSL. (Mecsas Aff. at ¶ 9). He even suggested that SHSL add interest to this amount until the next payment was made. (Id). The next payment due to Mecsas was one-third of his capital account which is $46,591.37 and which was due on January 21, 2003. (Complaint, Ex. B at ¶ 3). Obviously, the capital account payment exceeded the deferred compensation payment significantly, even if interest had been included. Therefore, when the complaint was filed in October, 2003, Mecsas was owed $27,207.96, less any applied interest, as of January 21, 2003 and $19,383.41 as of July 1, 2003. Since then, he is owed another $19,383.41 as of December 1, 2003, and $46,591.37 on his capital account as of January 21, 2004. In total, SHSL owes Mecsas $112,566.15.

Hillman has received nothing from SHSL pursuant to the terms of his Letter Agreement. Accordingly, Hillman was owed $34,038.72 on his capital account as of June 30, 2003 and $13,125.20 of deferred compensation as of July 1, 2003 when the complaint was filed. Since

6

then, he is owed another payment of deferred compensation as of December 1, 2003 for a total owed by SHSL to Hillman of $60,289.12.

## ARGUMENT

### I. This Court Has Personal Jurisdiction Over The Individual Partners Of SHSL.

A. The Standard of Review.

As the defendants point out in their brief, in order to determine that a Massachusetts court has personal jurisdiction over a defendant, two questions must be answered in the affirmative. (Def. Mem. at 7). First, is the question of whether the defendant has met the standards imposed by the Massachusetts long-arm statute, M.G.L. c.223A §3(a) – (g). Snyder v. ADS Aviation Maintenance, 2000 WL145110 (Mass. Super.). Second, it must be determined that the exercise of personal jurisdiction over the defendant is consistent with the due process clause of the United States Constitution. Better Boating Association, Inc. v. BMG Chart Products, Inc., 1998 WL408976 (Mass. Super.)

The only portion of the Massachusetts long-arm statute which is applicable to the facts of this case is as follows:

> A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth…

M.G.L. c. 223A § 3

The standard of whether personal jurisdiction by a court over a defendant meets the requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution is whether the plaintiff can establish that the defendants had minimum contacts with the forum state sufficient to not offend "traditional notions of fair play and substantial justice".

7

Calder v. Jones, 465 U.S. 783, 788 (1984) citing Milliken v. Meyer, 311 U.S. 457, 463 (1940) and International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

B. Long-Arm Statute.

For purposes of this action, as stated above, it must be proven to the satisfaction of this Court that the defendant partners of SHSL or their agent transacted business within Massachusetts from which arose the plaintiff's claims. M.G.L. c. 223A §3 (a)

1. Agency.

Under Massachusetts law, "[p]artners are the general agents of each other while transacting the partnership business." Bachard v. Vidal, 328 Mass. 97, 100 (1951). In Kansallis Finance Ltd. v. Fern, 421 Mass. 659 (1996), a partner in a law firm caused to be issued and ratified an opinion letter which contained fraudulent misrepresentations in conspiracy with others not his law partners. Id. at 660-61. The plaintiff sued the wrongdoers' four law partners, on the theory of vicarious liability, in the District Court for the District of Massachusetts. After trial, both the judge and the jury found no liability with respect to the four partners who were completely unaware of the issuance of the opinion letter and the fraudulent misrepresentations contained therein. Id. at 662. The Supreme Judicial Court ("SJC"), in an opinion authored by Justice Fried, answered certified questions of relevant Massachusetts law by the Federal Court of Appeals. Id. at 660. The SJC held that, if the wrongdoing partner had apparent authority to do the act, his innocent law partners could be vicariously liable for a tort committed within the course of the partnership business. Id. at 670.

The two Massachusetts cases, cited above, dealt with the liability of innocent partners for the tortuous wrongdoing by another partner. However, the Kansallis case discussed in some detail the general principles of agency and partnership law as they related to the subject matter of the case. Id. at 663-65. There, the SJC found that Restatement (Second) of Agency and the Uniform Partnership Act confirm that partners are agents of each other and the partnership when transacting the business of the partnership. Id. at 663-65. A Tenth Circuit Court of Appeals decision demonstrates that these principles are equally applicable to cases involving breach of contract. In Intercontinental Leasing, Inc. v. Anderson, the plaintiff sued to recover unpaid rent under leases of oil well equipment. 410 F.2d 303, 304 (10th Cir. 1969). The forum state, Kansas, has a long-arm statute substantially the same as that of Massachusetts. Id. at 305. The managing partner, a corporation, was solely responsible for the business of the partnership; the other 100 partners were solely investors. Id. at 304. Nevertheless, the court held that, for purpose of the long-arm statute, the court had personal jurisdiction over the investing partners because the general partner was acting within the scope of the partnership business when he acquired the leases and, therefore, was acting as the agent of the investing partners. Id. at 305.

In the instant case, very much like the tenth circuit case, the negotiation and execution of the Letter Agreements occurred in Boston, Massachusetts. (Declaration, ¶¶ 8 and 12). Robert Somma, as Managing Partner of the Boston office and then Managing Partner of the entire firm had apparent authority to enter into the Letter Agreements on behalf of SHSL. (Id.) The Letter Agreements were clearly part of the business of the partnership; they defined the rights and obligations of two withdrawing partners, a subject which is included in the SHSL Partnership Agreement. (Declaration, Ex. C, Article VII.) Accordingly, for the purposes of determining whether a Massachusetts court has jurisdiction over the individual partners of SHSL, Robert

Somma was acting as the agent of the individual partners of SHSL when he executed the Letter Agreements and, as such, brought them under the purview of the Massachusetts long-arm statute.

        2.        Minimum Contacts.

The International Shoe case, cited above, established that, to meet the due process standard inherent in the jurisdictional analysis, it must be established that the defendant, or his/her agent, had sufficient contacts with the forum state so as not to offend notions of fair play and substantial justice. International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). An SJC case, decided twenty-four years ago, established that simply signing a contract in Massachusetts, even though performance of the contract would take place entirely outside of Massachusetts, was enough to satisfy the minimum standards test. The Carlson Corporation v. University of Vermont, 380 Mass. 102, 106 (1980). Here, the Letter Agreements were signed in Massachusetts by all parties.

In Good Hope Industries, Inc. v. Ryder Scott Company, the SJC found that sending appraisal reports, monthly invoices, having telephone communications and accepting payment by checks drawn from a Massachusetts bank were enough contacts with the forum state to satisfy the due process consideration. 378 Mass. 1, 6-7 (1979). In this case, SHSL, as agent for the individual partners, established an office in Massachusetts, paid itself from a bank account in Massachusetts and had telephonic partnership meetings. (Mecsas Aff. at ¶¶ 6 and 7). In another case, a California hotel merely contacted Massachusetts entities and residents who had previously stayed at the hotel, soliciting return business. It had no agents and did not advertise in Massachusetts. Tatro v. Manor Care, Inc., 416 Mass. 763, 766 (1994). The SJC held that:

> Although an isolated (and minor) transaction with a Massachusetts resident may be insufficient, generally the purposeful and successful solicitation of business from residents of the

> Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement.

416 Mass. at 767 (citations omitted).

SHSL partners from the Philadelphia main office, together with SHSL partners from the Boston office would solicit new business in Massachusetts by meeting with representatives of Massachusetts entities and making presentations concerning their expertise. (Mecsas Aff. at ¶ 6.) This fact, together with all of the other contacts the SHSL partners had with the Boston office, as outlined in the Mecsas Affidavit, surely go beyond that necessary to satisfy the minimum contact necessitated by the due process clause.

    C.    <u>Integration Clause.</u>

In Massachusetts, when parties to a contract insert an integration clause, it is assumed that they have done so because they intend that all of the terms of their undertaking are contained in the contract and parties need to supplement those terms no further. <u>Elias Brothers Restaurants, Inc. v. Acorn Enterprises, Inc.</u>, 831 F. Supp. 920, 927 (D. Mass., 1993). The Letter Agreements each contain an integration clause, cited above. (Complaint, Ex. B at ¶ 14; Ex. C at ¶ 15.). It had to be the intent of the parties to the Letter Agreements that they constituted the entire agreement and that they superceded all other agreements between the parties such as the Partnership Agreement and the Deferred Compensation Agreements. Such integration clauses are recognized and enforced in Massachusetts. <u>Agri-Mark, Inc. v. Niro, Inc.</u>, 233 F. Supp.2d 200, 208 (D Mass. 2002.)

That being the case, there is no argument possible (although the defendants make one and ignore the integration clause) that one must consult the Partnership Agreement and the Deferred Compensation Agreements for the proposition that the individual partner defendants are not liable for any claims under the Letter Agreements. (Def. Mem. at 12-13.) Given the provisions

11

of the Partnership Agreement and the Deferred Compensation Agreements, it is clear that the parties knew how to protect the individual defendants from liability. (Declaration, Ex. C, Section 11.03 at 26; Ex. D, Section 8(i) at 12; Ex. E, Section 8(i) at 13.) Courts have found that omissions such as this one do not result in ambiguity when the contract itself is detailed and complete in other respects. Bendetson v. Coolidge, 7 Mass. App. Ct. 798, 802 (1979); City of Haverhill v. George Brox, Inc., 47 Mass. App. Ct. 717, 720 (1999). The omission of the limitation of liability language together with the integration clause results in a conclusion that the parties intended not to exclude the individual partners of SHSL from liability for breaches of the Letter Agreements.

The Partnership Agreement and the Deferred Compensation Agreements, being superceded by the Letter Agreements, are simply irrelevant and immaterial to the analysis of liability under the Letter Agreements and the defendants' reliance on them is wholly misplaced. To the extent that the Letter Agreements mention specific sections of the Partnership Agreement, reference to those sections may be necessary. USM Corporation v. Arthur D. Little Systems, Inc., 28 Mass. App. Ct. 108, 116 (1989). Generally, that is not the case with the Letter Agreements. The reference to Section 11.01 of the Partnership Agreement in paragraph 3, dealing with capital accounts, is simply telling the reader that this provisions is in accordance with the terms of the Partnership Agreement and does not constitute an amendment or variation. However, in the Hillman Letter Agreement, the reference to Section 12.08 in paragraph 14, dealing with releases, does compel the reader to consult this provision so as to understand its terms. However, the Hillman Letter Agreement, unlike the Mecsas Letter Agreement, states that it supercedes the Partnership Agreement "except as otherwise specified hereunder". Thus, a court could conclude that the drafter of the Mecsas Letter Agreement wanted no reference to the

Partnership Agreement, while the drafter of the Hillman Letter Agreement (presumably the same person) anticipated limited reference to that document. In any case, the integration clause should be given effect and there should be no engraftment of any limitation of liability of the individual partners of SHSL onto the Letter Agreements.

D.  Income Partners.

The defendants claim that 39 defendants are income partners of SHSL and, as such, they are only employees and cannot be held liable under the Letter Agreements. Under Pennsylvania (and Massachusetts) law, if one holds himself or herself out as a partner and acts like a partner, that person legally becomes a partner. Gibboney v. Derrick, 338 Pa. 317, 319-20 (1940). However, there is also the requirement that a person relied on the partner's status. Lazarus v. Goodman, 412 Pa. 442, 445 (1963). Mecsas and Hillman readily agree that they knew the difference between full partners and income partners and that they did not rely on the status of the income partners. Accordingly, the income partners should probably be dismissed from the case.

The problem is that the plaintiffs do not know the terms of the employment of the income partners and do not know their identity at this time. The names of the defendants named in the Complaint were culled from the web page of SHSL which made no distinction between full partners and income partners. The identity of the income partners should be proven beyond simply a list of names. Further, the terms of the employment of the SHSL income partners should be disclosed to the plaintiffs. Once they have satisfied themselves that income partners truly have no liability for plaintiffs' claims, Mecsas and Hillman will agree to their dismissal.[3]

---

[3] The defendants have informed the Court and the plaintiffs that Richard Fineman and William L. Leonard were not served with the Complaint because they no longer work at SHSL. The plaintiffs accept this representation and agree that these two individuals should be removed as defendants.

13

## II. All Payments Due Under The Letter Agreement Are Accelerated And Are Immediately Due And Payable.

After arguing that Mecsas cannot hold the defendants liable under his Deferred Compensation Agreement because they have not missed a payment to him yet, which the plaintiffs have disproved, and after claiming that the plaintiffs cannot accelerate the payments due under the Deferred Compensation Agreements because the plaintiffs have not given correct notice,[4] which the plaintiffs have shown to be irrelevant, the defendants correctly cite to the Restatement (Second) of Contracts to determine whether the payments due under the Letter Agreement can be accelerated by this Court. (Def. Mem. at 15-18). Section 243(3) of the Restatement advises:

> Where at the time of the breach the only remaining duties of performance are those of the party in breach and are for the payment of money in installment <u>not related to one another</u>, his breach by nonperformance as to less than the whole, whether or not accompanied or followed by a repudiation, does not give rise to a claim for damages for total breach.

Restatement (Second) of Contracts § 243(3). (emphasis added).

The question is what the words "not related to one another" mean. As far as the plaintiffs can tell, this phrase has never been analyzed by a court in a determination of whether acceleration is appropriate under a given contract. It would follow, one presumes, that, if the installments are related to one another, acceleration would be the remedy and the plaintiffs could sue for a total breach, as the plaintiffs in this action have done. (Complaint p. 20).

Given the nature of the underlying debts of SHSL to Mecsas and Hillman, the plaintiffs argue that the installments are indeed related to one another. As explained in the Statement of

---

[4] If it were relevant, which it is not, the plaintiffs believe that they have given the correct notice of default and acceleration under the Deferred Compensation Agreement by serving the defendants a copy of the Complaint by certified mail, return receipt requested.

14

Facts above, the installment amounts of the capital account payments and the deferred compensation payments were determined by simply dividing the full amounts of the plaintiffs' capital accounts and the net amounts of their deferred compensation by two arbitrary whole numbers. There is no interest running with respect to these payments which would distinguish one installment from the next, either by the amount of the installment or by the percentage of principal to interest. Rather, these installment payments are merely one-third or one-twentieth of four whole numbers. Moreover, the acceleration clause in the Deferred Compensation Agreement[5] is evidence of the recognition by SHSL that the payments thereunder to a departing partner were in fact related one to the other. It is clear that the parties to the agreement understood that one lump sum was owing, but for the convenience and ease of SHSL, it could be paid in twenty equal installments. It was equally clear that if one payment were missed when due, that accommodation was ended and the lump sum or its balance was immediately due. Central to the concept of the Agreement was the total amount owing and not the installment, each installment being but a fraction of the whole.

It is difficult to imagine how better any installment payments could be related to each other. It is perhaps not so curious that a court has not, to the plaintiffs' knowledge, distinguished between related and unrelated installment payments. Acceleration clauses are common occurrences in commercial debt instruments. Nevertheless, this Court must give consideration to the meaning of the phrase in the Restatement and what the drafters contemplated as the distinction between related and unrelated installment payments.

In analyzing this distinction, the Court should consider the result which would occur if the Court deemed the installments unrelated and, thus, the debt by SHSL to Mecsas and Hillman

---

[5] While the Deferred Compensation Agreement is superceded by the Letter Agreements, its provision as to the relation of the periodic payments is instructive.

15

could not be accelerated. If that were the case, the damages which Mecsas and Hillman could recover would be the installment payments which had not been paid at the time damages were awarded. John Hancock Mutual Life Insurance Co. v. Banerji, 2000 WL1798555 at *15 (Mass. Super.). This would be the unpaid payments set forth above to which, most probably, would be added the two payments of deferred compensation due to Mecsas and Hillman next July 1, 2004 and the capital account payment due to Hillman on June 30, 2004. This would mean that Mecsas could recover only $131,949.56 of a total debt of $527,442.20 and Hillman could recover only $107,453.04 of a total debt of $364,261.15.[6] Mecsas and Hillman would have to wait another year to file suit again, each for two missed deferred compensation payments and one capital account payment. After that year, only deferred compensation would be due and Mecsas and Hillman would have to sue every year for the seven years after next year to recover approximately $40,000.00 and $26,000.00 respectively. Such a result is completely anomolous. The law cannot provide such a cumbersome and expensive process to recover the debt which is so clearly owed but which has been so clearly repudiated.

In order to avoid such a result, this Court need only find that the installment payments are related to each other, which they clearly are. They are merely fractions of the whole. One installment has no characteristic which is not common to all of the installments of that particular debt. The defendants are wrong; the plaintiffs have not alleged a partial breach, they have alleged a total breach. (Complaint ¶¶ 117, 125). SHSL does not intend to pay Mecsas and Hillman what SHSL owes them pursuant to the terms of the Letter Agreements. The plaintiffs should be permitted to recover the full amount owed to them based on the fact that each set of installment payments are related to each other.

---

[6] These calculations were done using the information in the Letter Agreements and in the Complaint. (Complaint; Ex. B; Ex. C)

## CONCLUSION

For the reasons set forth herein, the plaintiffs request that this Court deny Defendants' Motion For Judgment On The Pleadings And/Or For Summary Judgment. The plaintiffs have demonstrated that the individual partners are liable to the plaintiffs under the terms of the Letter Agreements on agency principles and on the basis of minimum contacts. The plaintiffs have further established that acceleration of the entire debt owed by Schnader Harrison Segal & Lewis LLP to Michael E Mecsas and Donald C. Hillman is appropriate because the installment payments due with respect to each debt contained in the Letter Agreements are related to each other. Based on these analyses, the defendants' motion must fail.

Respectfully submitted,
MICHAEL E. MESCAS and
DONALD C. HILLMAN,

*Carol R Cohen*

Robert C. Gerrard/BBO #189800
Carol C. Cohen/BBO #088660
Davis, Malm & D'Agostine, P.C.
One Boston Place
Boston, MA 02108
617-367-2500

Dated: April 19, 2004

CERTIFICATE OF SERVICE
I HEREBY CERTIFY THAT ON THIS DAY A TRUE COPY OF THE ABOVE DOCUMENT WAS SERVED UPON THE ATTORNEY OF RECORD FOR EACH OTHER PARTY BY MAIL/BY HAND ON
DATED 4/19/04
SIGNATURE *Carol R Cohen*